We'll hear argument next in Case 12-246, Salinas v. Texas. Mr. Fisher. Thank you, Mr. Chief Justice, and may it please the Court. The Fifth Amendment prohibits using a person's silence during a noncustodial police interview against him at trial, and nothing about the specific facts of this case give this Court cause to refrain from applying that rule here. To the contrary, the State's closing argument in this case, urging the jury to find Mr. Salinas guilty because, quote, an innocent person would have denied law enforcement's accusations, strikes at the core of everything the Griffin Rule and, indeed, the Fifth Amendment is designed to prohibit. It evokes an inquisitorial system of justice. It effectively shifts the burden of proof onto the defendant, and it demeans individual dignity by conscripting the defendant as a product of his own demise. Now, the Texas Court of Criminal Appeals resisted this logic and held that the Fifth Amendment didn't apply because there was supposedly no compulsion in this case, in the sense that there was no physical or psychological coercion of the kind that's inherent in custody. But the Texas Court of Criminal Appeals simply misunderstood the nature of a Griffin claim and the nature of the compulsion. The compulsion that Mr. Salinas faced was when the police asked him the question about ballistics evidence, there was nothing he could do to avoid supplying the State with incriminating evidence that it could use against him. If he answered the question why isn't it like the Berghoof case. There was a case of someone who was given Miranda warnings, and even so the Court said he was silent, he didn't invoke the Fifth Amendment, therefore his silence can be commented on. No, that's not the holding of the Burgess case, with all due respect. The Burgess case was about whether his subsequent statements could be used against him. This Court didn't hold that his silence that preceded those statements could be used against him, and indeed that would be contrary to Miranda itself in footnote 37, where the Court said if somebody stands mute in a custodial setting in the face of law enforcement accusations that were not the law. Breyer. What's the line? What is, I mean, Joe Smith leaves a blank and part of his tax return. IRS gets it, later it turns out to be relevant, and the prosecutor wants to say, hey, he left this blank. Okay? Now, Griffin doesn't apply, right? I mean, you're not going to say that any time you refuse to tell the government anything, and later out it turns to be relevant to a criminal prosecution, that that's taken as an invocation of the Fifth Amendment. I mean, do you want to go that far? No, I don't need to. Okay. Then you need a line. Then what is the basis? Then you need a line. So where is the tax case, then we have a case they're selling tickets to the policeman's ball, and somebody comes to the door, the policeman says, hey, I haven't seen you around before, and he doesn't answer. Okay? Now, that's probably not an invocation. And then we have the clear line, which in custody, and now you want to extend that line. And so what I want to know, if I follow you and extend it, what line do I draw? Well, it's sufficient to decide this case to say that a noncustodial police interview during the investigation of a crime, where they're interviewing somebody about, who is, as the State concedes, a suspect in a crime. Now, it may well be that Griffin extends a little bit further. And remember, the Solicitor General, at least, agrees that Griffin applies in a noncustodial setting. Kennedy, it's well settled that when you're examining the witness and he takes any questions, he suddenly says, I don't want any more questions, that that's he's waived if you're in court, if you're examining a witness on this thing. So against that background, suppose in this case the facts were just about the same and he said what, the police said, what would you do if we matched the shotgun sales, and he said, well, and then he starts to cry. He said one word, well, and he starts to cry. Admissible? I think that would be admissible, but it would be forbidden for the State to do that. Because he said well? But could the police officer also testify that and then he started to cry? Perhaps. But the State, what the State would not be able to do would be to argue that his silence and refusal to answer the question demonstrates his guilt. What would the prosecution say? He said well and started to cry and he never told us anything else. That final sentence that I used is impermissible? I think that may well cross the line. You have the exact issue that arises already in custodial settings, where under Doyle and footnote 37 of Miranda you've held, that silence can't be used against a criminal defendant. So, Justice Kennedy, you're right that questions will arise in two ways. One is whether words that the defendant uses are tantamount to refusing to answer the question. And then there's a second question about physical demeanor evidence. The law is already sorted out on this in the lower courts, and I think it's a very workable test. The Solicitor General agrees with what it is. And the reason why this Court hasn't seen a case or itself seen a case like that is because once the rule is established that the prosecution can't use silence against the defendant, the temptation drops away to try to introduce that evidence for some supposedly different purpose. Ginsburg. Mr. Fisher, but then do I understand correctly that you're saying demeanor is different. So, although it was impermissible to comment on silence, it was okay to say he looked down, he seemed to be sweating, he was very nervous, he was shuffling his feet. Insofar as demeanor evidence that the State offers has communicative value, and the State argues that it has communicative value, independent of simply what the defendant looked like when he remained silent, then it may well be able to introduce that evidence. Now, as I said, just finishing up telling Justice Kennedy, you're not going to have hard cases in this respect, because once the temptation, once it's clear that silence can't be used, then the prosecution, I think, has little motivation to try to walk that line. And, indeed, I think it would be appropriate in a case if the prosecution said, look, the fact that the defendant started crying we think is relevant for some reason, independent of what he, of failing to answer the question, the jury could be instructed, as they are in Griffin, Griffin settings already, that you aren't to consider the defendant's refusal to answer the question against him. Sotomayor, Mr. Fisher, my, I have a number of problems. The first is, your rule would seem to be giving noncustodial defendants more rights than those defendants in custody, because you're arguing that, I think, that a greater degree of expression other than silence would be needed to show the invocation of the privilege against self-incrimination. Fisher, are you trying to equate the rights that a defendant has to custodial and noncustodial with respect to invocation? Fisher, No. And this is where Justice Ginsburg's question came from, so I think it's very important for me to be clear on this. A person in a noncustodial setting still has fewer rights than a person in a custodial setting. What the Court held in Burgess is that if the defendant wants to exercise his prophylactic right under Miranda to cut off police questioning, notice the words this Court used, that has to be expressly invoked in some manner during the interrogation. Sotomayor, I have an easier problem understanding this argument with respect to, and I'm going to ask your adversaries, with respect to the situation in which someone is approached by the police and said, come in and talk to us. I have a hard time understanding how the refusal to come talk to them could be held against them. There I understand it, but here your defendant went in and talked. So once he chose to do that, why does he get more rights than Burgess did, who remained silent for two and a half hours? If the Court wasn't willing to find that that was an invocation of the privilege against self-incrimination, why would it find the refusal to ask? Answer one question indicative of the privilege against silence. Fisherman, if I may, let me focus on the Burgess question and then turn to the selective silence point. The reason why he doesn't have Mr. Salinas doesn't have the right that Mr. Burgess had to cut off questioning. That's the right that has to be expressly invoked and that, indeed, can only be effectuated in the setting. There was no issue in Burgess, I don't think, that his silence could be used against him. The State never argued in the Burgess case that because he failed to answer for two hours, that shows he's guilty. What the State argued in Burgess was the fact that he later confessed is what shows that he's guilty. Kennedy, are you saying that before the Miranda warning is required, you cannot invoke the Fifth Amendment? Fisherman, I mean, that's how I understood it that day. I know you're not arguing that, but that's how I understood it. Fisherman, let me separate two rights. One is the prophylactic right under Miranda to have police cease asking you questions. That's one right, and that right has to be expressly invoked in some manner during the interrogation after you've been warned in order to effectuate it. There is a separate right, which is the genuine Fifth Amendment right, to remain silent. And this Court said in Miranda itself, and it's never questioned since, that that right doesn't have to be expressly invoked. Kennedy, it can be invoked, and that might make a big difference. And your brief, you acknowledge that most citizens know they have a Fifth Amendment right. Fisherman, so I think, Justice Kennedy. Kennedy, and so if there's questions that are somehow troublesome, you say, I'm invoking my Fifth Amendment right, go away, even if you're not in custody, even if Miranda doesn't apply. Fisherman, right. Kennedy, and your client didn't do that here. Fisherman, he didn't. And so the question, I think, unless the Court's prepared to hold that even an express invocation could be used against him, then it reduces to the question you framed, Justice Kennedy. And so ask yourself whether there's any good reason to require an express invocation in that setting. Mr. Salinas, remember, did expressly invoke his right, Fifth Amendment right to remain silent, at trial in a timely manner, asking for the evidence to be excluded. So the question is whether there's a reason to ask him to do it sooner. And our argument is it's unnecessary, unfair, and a rule like that would be unadministrable. So let me walk through those if I can. It's unnecessary because all the cases the Solicitor General cites for an express invocation principle involve a scenario where the government has no good reason to know that it's seeking incriminatory information. And, Justice Breyer, this is the limiting principle that you were searching for in the tax cases and the like. If the government doesn't know or have good reason to know that the defendant who is silent is likely to be exercising his right, then the government needs to be put on notice, because the government may well challenge that. Maybe it will go seek a court order. It may well decide to grant immunity. It may do a number of things. But here the government would do absolutely nothing different. Police would have done absolutely nothing different. Indeed, look at the record in this case. What the Solicitor General says is that Mr. Salinas should have said, I refuse to answer that question. And if he had said that, everything would be different. But look at what the State argued at trial and what the officer testified. The officer testified, when we asked him that question, he wouldn't answer. The prosecution argued to the jury, he refused to answer that question. So there's no ambiguity in the setting whether he was remaining silent.  Well, there's no doubt he was remaining silent, but the issue is whether he was trying to raise his Fifth Amendment right. Now, suppose your rule were, whatever the situation, where either the individual expressly raises his right or, at the least, it's a fair implication from the circumstances, that he was trying to assert his right. Would that be a sensible rule, and if so, how would your case stack up? Yeah. I think as long as the latter part of that test, Justice Breyer, can be satisfied by exercising the right, that is, remaining silent, in a setting in which the government has every good reason to know that the person is most likely to be relying on the Fifth Amendment, and here, where they're investigating a murder and bringing in somebody as a suspect and asking him, basically, did you commit the crime, I think it's a fair assumption, at least absent any clarification by the police. Remember, when he was silent, the police would have had every right to say, Mr. Salinas, why aren't you answering the question? And so the police could clarify, but absent any clarification from either the police or the suspect, the more likely-than-not scenario, and that's the test the Solicitor General agrees should be used, the more likely-than-not conclusion there is that he's exercising the right. Sotomayor, how would you deal with another common situation where a defendant meets up with the police, gives a story, and then later changes the story, and the question is asked at trial, you never volunteered that story to the police when they questioned you? Would that be silence to you? Would that be an invocation of his right not to incriminate himself? Would you – would the prosecutor be barred from arguing to the jury, as often is done? He chose to say this, but not that, so this is a made-up story. Fisherman, No, Justice Sotomayor, for two reasons. One is, if I understood your hypothetical, it sounded like the defendant may have been on the stand, and that would be an impeachment scenario that's entirely different. Sotomayor, but even – Sotomayor, but sometimes they come back and later do a different confession. Fisherman, but even if that were the case, then that would be basically using his statement against him. And so a material omission from a statement is not the same as silence. Here, Mr. Salinas was silent. Now, it's also not just that there's no good reason to require some sort of magic words to be spoken by the suspect, but it's unfair. Remember, the States tell you in their amicus brief that if you affirm in this case and adopt the rule they're asking you for, police officers are going to tell people in custody, which would be nothing more than an accurate statement of the law. Sir, if you are silent in response to any of our questions, the prosecution is going to argue that that shows that you're guilty. They're also going to have every good reason to bring people in, and I think this goes a little bit to Justice Kennedy's question, and perhaps just yours as well, the fact that Mr. Salinas did agree to commence this interview. Remember, the agreement to bring people in is that he's not in custody. So let's say he's answering the questions, all of a sudden he gets a particular question and he says, you know, it's getting late, I think I'm done, I'm going to go home. Is that an invocation of the Fifth Amendment right? Fisherman, I think you'd have to ask that to the Solicitor General. I don't – I'm not the one requiring an invocation. And that is part of the administrability problem that the rule raises. I have no idea of all the permutations, one of which you can imagine many more. Roberts, is that something that could be used against him at trial? Fisherman, it could be introduced. It's hard to understand how that is probative, the fact that he said, I have to leave now. Roberts, it's probative that he says that, he's answering all the questions, they're fine, all of a sudden they say, well, is your shotgun going to match the shells? And he goes, gosh, it's late, I'm going to go home. That seems as probative as the silence. Well, and so what the State cannot do is what it did in this case, and sort of transform that into he refused to answer and therefore it shows he's guilty. And if I could go back to the part of the unfairness and the difficulty here, it's not, it's just that, yes, Mr. Salinas did come to the police station, but remember why he came to the police station? Because they said, we want to bring you in to clear you as a suspect, to get elimination prints. So he was effectively told to come in so that we can clear you as a suspect, asked perfectly innocuous questions at the beginning of the interview, and then everything shifted on a dime to this one gotcha question. And I think it's perfectly reasonable and customary in out-of-court settings where the defendant isn't on the stand and so telling some story and now trying to backtrack it, but out-of-court to be able to selectively exercise your right to silence when you feel, now law enforcement is turning against me. And remember, this is the other part about, Justice Kennedy, your question. Of course, people know they have a right to remain silent, so why not, why not ask them to invoke it? Remember, people in this setting generally don't have lawyers. They don't have a right to lawyers. What does the layperson know? The layperson knows I have a right to remain silent. That's what the layperson knows. The layperson doesn't know I have to say some sort of magic words, and the police, believe me, aren't going to tell him that he does. Alito, did you draw a distinction between Mr. Salinas' situation and someone who's questioned in the home, in the person's home, or on the street? No, I don't think there is a relevant distinction there, Justice Alito, as long as it's an investigatory interview. And this Court has said time and again, whether it's Berkmer in a traffic stop or Royer, that the police can try to initiate consensual encounters. And the Court has said time and again that people don't have to participate in them and they can cut them off at any time. And it would be odd. Alito, what if the person was totally unknown to the police, but called up the police and said he wants to talk to them for some purpose? You wouldn't draw a distinction between that situation? And, well, if he wants to talk to them, I'm not interested. I would fight for a man's life. He wants to talk to them, and then in the course of this conversation, the same thing happens that happened here. I think that might, depending on the precision of the hypothetical, be a little bit of a difficult case, different case. But if the person said, I want to talk to you about criminal activity, started giving statements about a past crime, so it was an investigatory interview, I think it may well apply. You're giving us Miranda, not Miranda, custody, not custody, gray area. That's what you're arguing? You want a gray area opinion to be written? No, I don't want a gray area opinion. Remember, Justice Kennedy, at least the Assistant Attorney General, and I'll let the State speak for itself, but the Assistant Attorney General agrees that Griffin rule applies in a noncustodial setting. I totally understand there's a bright line between custody and noncustody, and so a custodial suspect is in a different situation than a noncustodial suspect. But all I'm saying is, again, in agreement with the Assistant Attorney General, whereas all we disagree on is whether the magic words need to be spoken, that a person who is at least in a police investigatory setting, and so the police would reasonably expect that a failure to speak or answer a question was relying on the Fifth Amendment. Sotomayor, I'm assuming now that I'm thinking about your argument, you would argue that even in a custodial setting, a prosecutor couldn't say, I asked him, did he shoot his wife, and the prosecutor can't argue that because he refused to answer, that makes him guilty. That's precisely what the Court said already in footnote 37 in Miranda, what the lower courts have depended on for a generation now, and I don't think my opponents are even arguing to the contrary. Well, in fact, at most trials, district court judges tell juries, the evidence is not the unanswered question, it's the question plus the answer. Right, right, fair enough. I think that's perfectly well-established law. And so the reason is, is there any reason to distinguish, for purposes of the Griffin rule, I understand there's reasons to distinguish in the settings that Burgess raises, but for purposes of the Griffin rule, is there any reason to distinguish between a custodial and a noncustodial setting? Yes, the answer is going to be yes, because we're going to hear it in one minute, because it follows a fortiori from Burgess. You know, if you're going to have to make an explicit statement to invoke your Fifth Amendment right when you're not in an inherently coercive setting, I mean, that's going to be the argument. You're not in an inherently coercive setting, as you are in the Miranda situation. You're not at trial, and outside those two situations, you have to say explicitly I'm invoking the Fifth Amendment or tap on the Constitution or something in order to indicate that's the issue and that's the reason why. Justice Breyer, this is crucial. Yes. If Mr. Salinas had been in a – if everything about the case was identical, but he'd been in custody, there would be no argument that his silence could be used. Right. And that's saying, because there we have a line, it's called the in-custody line. Once you get outside of custody, you've got to do it. But it's not because of the physical or inherent pressures of custody, because what the Court has said time and again is that after somebody receives their Miranda warnings, they have a free and deliberate choice whether to talk. I don't want to make the government's argument for them. They'll make it very well. Well, no, but I do want to make sure that the Court understands the critical difference between the express invocation requirement that this Court established in Burgess and what I'm asking for today. And the express invocation requirement in Burgess is the – is to administer the Miranda prophylactic rule that the police have to stop asking somebody questions when they invoke their rights, the rights they've just been advised of, remember. It didn't hold in Burgess, and it's never held that if somebody is Mirandized and let's say Mr. Burgess was Mirandized and just remained silent for two hours, then the police said to themselves, oh, this guy's never going to talk, we end the interview. There would have been no argument the State could have made in that case that his silence could be used against him. And so I understand that, you know, that custody is different, but in terms of the express invocation requirement, there's no express invocation requirement in custody, and there's no reason to work here. Breyer, I think it is, at least in my mind, that if, after sitting there for 45 minutes or maybe it was an hour or 45 minutes, without saying anything, I don't remember, I'm maybe taking the dissenting position, but if when he answers, doesn't answer over that long period of time, but doesn't say, I want to remain silent, if that long period of behavior is insufficient without the express statement of the State to show that he wanted to remain silent, so outside the custodial setting, should it be insufficient to simply remain silent to show that, you see, it's argument by analogy, I think. Fisher, I understand, but his silence wasn't able to be used against him in Burgess. His later statements were. And so, yes, you could have a scenario. Kagan.             Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Obviously, in Burgess's case, it was insufficient for the purpose of cutting off police questions. Fisher, that's not the case here. The question here is whether it's sufficient or insufficient for the purpose of allowing his silence to be used against him at trial. So it's an entirely different question, isn't it? Fisher, that's exactly my point. And, remember, again, the layperson in this setting who knows — if there's one thing the layperson knows, and most every American knows, is they have a right to remain silent. So somebody nervous in this setting without a lawyer, the one sanctuary they have is simply not to talk. If you issue an opinion that says, as the Senator General would like, you have to pronounce some sort of magic words, it's terribly unfair and terribly misleading, and, again, for no good reason. And it raises all kinds of administrability problems. The Court is going to have an absolute, I think, flood of cases of all the permutations of somebody under different kind of police warnings or the other that may be given ahead of time, and different kind of verbal formulations. Maybe he says, I'd like to talk about something else. Maybe he says, as the Chief Justice explained, I'm going to leave now. Maybe he actually just doesn't show up for the interview. There's innumerable permutations. The easy rule— Silence cannot be, can never be commented on in any noncustodial situation. And I didn't think you were willing to go that far when I was questioning you previously. You're going to have the same kind of line-drawing questions, aren't you? No. Where was it held? What was the nature? Who initiated it? Was the person really under suspicion? What was the purpose of the questioning? So as to where you draw the line, if I understand your question, as to where an express invocation before trial would be required, you are going to have to draw a line. I think it's very easy to draw the line and just say a police investigatory interview, because that's the setting where the police have every reason to believe that silence is an exercise of the right. All the other settings, whether they be tax settings, whether they be immigration cases, all the totally disparate settings the Solicitor General cites cases involving, it's perfectly reasonable to require an advanced invocation there. But remember, the Court said in Chavez that the Fifth Amendment is a trial right. And so invoking it at trial is perfectly timely in the ordinary setting. The only question is whether you should have some sort of special requirement for a special reason. We think there's no good reason and it would be very unfair. I'd like to say. I understand your rule. I'm sorry. I'll ask it. Thank you, counsel. Mr. Curry. Mr. Chief Justice, and may it please the Court. Absent an invocation, a defendant's failure to answer a question during a noncustodial voluntary interview should not be protected by the Fifth Amendment and should be a defense. Sotomayor, I mean, really what you're saying is merely because I ask you the question and you choose not to answer it makes you guilty. Well, I'm no problem. Here you're asking about the crime of investigation. But you could have asked him, did you kill Joe Blow on another street, and if he had remained silent, you would be arguing that proves he's guilty. Well, I could introduce that at trial. And you would be arguing it would be sufficient to convict him, that you merely asked the question and he remained silent about it shows his guilt. Yeah. I don't know that that would be sufficient to convict him. And that hypothetical might suggest that the probative value of that particular failure to answer a question was less than that. It's a little scary to me that an unanswered question is evidence of guilt. Well, I'm not arguing that the physical response is not admissible. He's just arguing that the mere asking of a question and a failure to answer it, you can't argue as a prosecutor that that shows someone's guilty. I think one of the things we're asking the Court to do, Justice Sotomayor, is to recognize that silence, certainly as occurred in this case, doesn't always occur in a vacuum. And the defendant's failure to answer this question, accompanied by the things that he did along with or contemporaneously with, you know, the shuffling of the feet, the biting of the bottom lip, revealed a guilty conscience on his part. It'd be up to the jury, wouldn't it? The jury might well agree with Justice Sotomayor that it doesn't prove anything that he didn't answer a question, right? Right. I mean, that's what the question is whether you can ask the jury to consider that. Correct. And I think that's the import of our argument. And we reference this Court's language in Baxter to that extent, that a jury can give what weight they wish to give it. Sotomayor, my hypothetical that I posed earlier, if the police call you and say come in for questioning and you ignore them, is that an invocation of the right to silence or not? I don't know that that's an invocation, Your Honor, but I don't know. Why could you argue that that's silencing? Number one, I don't think a prosecutor ever would argue that, because that's ambiguous and not probative, and I think not probative for someone just to not come in when the police offer them a chance to come in. No, no. Argue what the legal theory of guilt is in that situation. Right. The legal theory of guilt in that situation would be lessened than it is in this case, because there's no – there's nothing to suggest that that defendant was guilty necessarily because he decided not to show up to the police. But here in this situation, the defendant's fair to answer the question, accompanied by the other things that he did, did reveal a guilty conscience on his part, and there was nothing to reflect that he was trying to do. So why is it – would it be admissible that someone decides – someone comes in and they say – police say to him or her, we're investigating this crime, help us. They start asking questions, and it's clear from the first question. There's a waiver of Miranda, and from the first question – the first question is, did you kill this person? The guy remained silent. They ask a whole bunch of other questions, and he remained silent. Has he invoked his right? I don't believe he has, Your Honor. I mean, if he – you said he was provided Miranda rights, so maybe they feel he's in custody or not. So a prosecutor could go into the jury and say he waived his Miranda rights and he's guilty because he refused to answer our questions. He's guilty if he revealed a guilty conscience, Your Honor. Well, he wouldn't say that. He would say one – one of the indications of his guilt is that he refused to answer the question. No prosecutor would argue that that alone would support a conviction, right? Correct, Your Honor. And that's not what we're – that's what we're asking the Court to do here. We're not asking the Court to say that every time silence occurs, that's necessarily going to be probative, and every time silence occurs, that's necessarily going to be something that we utilize. We're merely saying that in this particular situation, the defendant needs to tell something to the police in order to reveal that he's relying on a constitutional right and not merely having to do that. I'm sorry. Just to nail that down, because your first three words were absent in invocation. Yes, Your Honor. Are you now adopting the Solicitor General's argument? Because your brief goes further. So are you now saying that the crucial thing is the invocation? I believe that has been our position, Your Honor. We do have some alternative arguments as well based upon this Court's jurisprudence. But I think the government and we both agree that the defendant in this particular situation would need to invoke, and that is the basis upon which we proceed. And we're not proceeding just upon Burgess v. Thompson. And so you agree with the government that if he had invoked, the Fifth Amendment right would come into play? We would not attempt to – we would not attempt to introduce anything, for example, I plead the Fifth, I don't want to talk anymore, something like that. No, we would not be introducing that. I do believe that would be, you know, a rule violation, a violation of the rule. That's the line you're drawing between his just not answering and his saying, I don't want to answer. Correct. If I understand your question. The latter can't be introduced to the jury, but the former can. Correct. That's the rule. Why would you draw that line? I think, Your Honor, I would not want to – I would not want to introduce a statement that a defendant was relying on a constitutional right by saying, I don't want to talk anymore, as opposed to the mere silence, which might be probative in conjunction with other evidence. Doesn't the mere silence suggest I don't want to talk anymore? It might, but it also might suggest that he's having difficulty coming up with an exculpatory response. It might suggest that he can't think of a good answer. It might suggest that he's worried about the question, and he's thinking more about how worried he is about the question than how he wants to respond to it. Particularly since he did want to talk some more, right? Correct. He continued to respond, you know, several questions thereafter, continuing to provide, you know, exculpatory responses. But isn't the most logical inference from the silence not that he isn't quick enough to come up with an exculpatory answer, but that it would incriminate him if he answered? Yes, Your Honor. That may be – that may be a permissible inference, but I do not believe that that necessarily means that he was invoking his Fifth Amendment right, because he did continue to talk. He already knew what the police were investigating. But he could – he could invoke the Fifth Amendment with respect to one set of questions and not another. And what's disturbing me about your position, if it's – if you have someone being interrogated who is savvy, will say, I plead the Fifth, and somebody who is not that smart is just silent, to make a difference between those two people on whether a comment can be made on the Fifth Amendment to respond is – is troublesome. Your Honor, I think that would be consistent with this Court's jurisprudence to – to allow the use of evidence if there was no invocation involved. In Jenkins v. Anderson, Justice Stevens recognized the importance of an invocation, even in – even in that type of situation. This Court – it's not just Burgess v. Tompkins that we're relying upon where the Court has recognized the necessity of an invocation. Gardner v. United States says the same thing, that an invocation is necessary for Fifth Amendment rights. And I know that we don't have a case that is squarely going forward with this one, but all the defendant would have to say is, I don't want to talk anymore or I don't want to answer that question, and then we would be in a completely different posture at this point. But here, the defendant failed to answer a question and did other things that revealed a guilty conscience on his part, and that is precisely the type of evidence that we believe that we can interdict. Kagan in a case like Burkheist, which is in a custodial setting, if the defendant there had not ever said anything, had gone through the entire interview and really never said a word, so that the police kept asking him questions, but he never said anything, the prosecutors could then not go in and say, look, for 3 hours we asked him questions and he didn't talk. That would be off limits. And the question is, if that's off limits, why shouldn't this be off limits as well? If there's no invocation necessary there, for some of the reasons that Justice Ginsburg was saying, why should there be an invocation requirement here? Well, number one, because the hypotheticals are different. In our particular situation, the defendant did answer questions and only did, you know, fail to answer one particular question. Kagan in your case there happens to be a kind of selective answering sort of question, but let's say, let's take that out of the picture, all right, and just say, you know, he just didn't want to answer questions, all right? So then the question is, why would that case be any different from the case that I posited? Okay. In Burgeis v. Tompkins, this Court looked at the ambiguous nature of whether or not the invocation had occurred. If in your hypothetical the defendant failed to answer any questions whatsoever there's no question. He didn't invoke, he just didn't answer. But it could be a suggestion where he was attempting to exercise the right because he never answered anything. But in our situation, the defendant can't be said to have been doing that. He can't be said to have been exercising the right because he failed to answer a question but answered several other questions.  but let's say, let's take that out of the picture, all right? So then the question is, why would that case be any different from the case that I posited? Okay. So you're pinning your argument, really, on the fact that he did a lot of answering. That's one of the reasons, Your Honor. On this, on this, you know, you can't pick and choose kind of argument. Well, we're saying that you cannot infer an assertion of a Fifth Amendment right based upon this. We cannot infer that he was necessarily asserting his Fifth Amendment right, whether it's a cutoff questioning or a stop talking altogether or, you know. So would it be fair to say that your argument is, look, you can't just, like, keep talking and talking and talking and at that point you have to invoke. If you've been doing a lot of talking and then decide you want to stay silent, at that point you have to invoke. But that's not to say that you have to invoke in every noncustodial encounter. Is that your argument? No. I think you need to invoke in every noncustodial encounter if you do not want, you know, the things that you say to be utilized against you. If you want to, you know, if you want to be prevented from that evidence being utilized, you have to say, I don't want to talk anymore, or I plead the Fifth or whatever the other. But I thought you said he didn't have to do that if he didn't answer any questions. Didn't you? Isn't that what you said? I took the words out of my mouth. No. No. If he didn't answer any questions, then it would be drawn closer to Burgess v. Tompkins. In which this case. Well, but in Burgess we found no invocation. Correct. Correct. But if. So Justice Kagan's question stands. But the defendant in Burgess did answer some questions, Your Honor, and that's what makes it different from Burgess, in that, in that case, the defendant did ultimately. Well, a few, as I recall. Correct. Mr. Curry, Burgess is different for a different reason. Burgess is different because the question in Burgess is what do you have to do to make the police go away. Here the police were not going away. There was no question of that. The question is what do you have to do in order to bar the prosecutor from introducing your silence at trial. So that's a really different question, isn't it? Well, it is a different question, but here I think the police were, quote, unquote, going away. I mean, they finished their questioning at some point. Exactly. That's why Burgess is irrelevant here, because Burgess said at a certain point, you know, you need to invoke in order to stop questioning. But that's not what's at issue here. But this Court's case law still requires an invocation. And the rule we're asking this Court to adopt would essentially settle the split that largely exists in the Bethlehem case law. Breyer, that is what I'm uncertain about this. And they cite page 468, note 37 of Miranda. What is the law in your opinion now in respect to and what case would support this? A defendant comes in, he is warned, given his Miranda rights, he says fine, and then he proceeds to answer a whole bunch of questions. Then they ask question number 432. He says nothing. They then go on to 433, 434, et cetera, and he answers them all. Okay? At the trial, the lawyer, the prosecutor, wants to comment on the fact that in the face of that single question, though answering many, many more, he remains silent. Does Griffin say he can't — the prosecutor can make that comment, yes or no? And I'd appreciate the government answering this question, too, because they're — if they're — they're — are they speaking here? Are you doing the whole argument? No, the government is also arguing as well. Well, that's the — I'd like to get the same answer. Yes. Because what — now, they cite for the proposition, I think, that it — that the prosecutor is forbidden to make that comment, note 37 of Miranda. Okay? I just read it. Correct. And I may be ambiguous on the point. It says you have the right to maintain mute in the face of an accusation. Right. I think the reliance on the footnote is — is — Oh, no, fine. But what's your opinion? I mean, what is the law in respect to that single point? And at least to me, I'd like to know your opinion on that. Your Honor, I do not believe that this Court has extended Griffin to this particular type of fact situation, and Griffin wouldn't apply to that. Is there any authority, or is it just your opinion that we have to go on? Well, I believe this Court would have had the opportunity to extend Griffin, for example, Doyle v. Ohio. The Court did not do that. This Court had the opportunity to extend Griffin in Fletcher v. Weir and did not do that. So I do not believe this Court has necessarily, you know, sought to always attempt to extend Griffin in that situation. Now, we — I see some ambiguity in the standing mute phrase from footnote 37. Does that mean not talking at all? Does that mean not answering one particular question? In your hypothetical, if what is approbative is it wasn't our case, you know, that might be something the prosecution would want to use without violating the Fifth Amendment right, because there's no clear indication that the defendant didn't in fact rely upon his Fifth Amendment right. Now, I don't want to, you know, misread footnote 37, but that's how we read footnote 37, because of the absence of — there's many, many cases cited there, and it's not clear that it's attempted to apply an extension to Griffin in that situation. What the rule we're offering here would not — would not change the law with regard to how it exists in much of the Federal circuits. In much of the Federal circuits, these defendants were the courts have held that we cannot utilize this evidence. Those defendants have, in fact, done something to invoke. So I think the rule that we're asking the Court to adopt would allow for that case law to stand, i.e., if a defendant says, I don't want to talk anymore, I plead the Fifth, you know, we're not asking this Court to issue a rule that says that we can introduce that. All we're asking this Court to introduce is consistent with this Court's case law that would require an invocation or some indication that the Fifth Amendment right was relied upon, and not just a difficulty with the question or I can't think up an exculpatory answer for that particular question, so I don't know what to say. I mean, there, the defendant is not relying upon a constitutional right. And I think we're asking this Court to look at whether an inference has to be made that a Fifth Amendment right is being done, or perhaps another inference can be provided. And Baxter v. Palmigiano allows for acquiescence, you know, to be something that we can utilize against a defendant. Here, the jury can't.  As you're telling me about a propulsion line coming, your adversary points out that under this scenario the police can ask you questions and say to you, you know, if you stay quiet in this question, I'm going to use it against you at trial. That police will actually do that, that they'll actually come in and tell defendants who are telling the story, you know, either answer or it'll be used against you. I could perceive then, Your Honor, the trial court upholding a claim by the defendant that he was coerced at that point. That at that point the officer So why can't you say that a call from a police officer to someone who says come in and talk, that that can't be used against them at trial as you gave me a different answer. You said it wasn't probative, but you didn't say Griffin would protect that. No, if – I don't know that I would say Griffin is protecting it, but what I would say is this Court's penalty jurisprudence would say that when a penalty flows directly from something the defendant is, you know, either saying or not saying, you know, that could be a problem. So when the officer says, you know, I'm going to hold against you your failure to answer a question, you know, that could be something where the Court might utilize as were some sort of penalties flown. Justice – Justice Stevens said in his dissenting opinion in McKeown v. Lyle that there's an appreciable difference between some sort of sanction, official sanction being placed upon a, you know, essentially a disobeying of an order as opposed to a voluntary choice arising from – from just a possible adverse consequence. And here I think the fact situation that confronts this Court in this case is just the risk of an adverse consequence and not something that necessarily is going to occur. However, if an officer says, I'm necessarily going to use this against you, the adverse consequence may become more tangible at that point. That isn't the facts of this particular case. I also want to disagree with Mr. Fisher with regard to his suggestion that the police essentially manipulated this. If you look on the Joint Appendix, page 14, lines 9 and 10, the officer clearly says that he wants Mr. Salinas to come down to the police station and talk, as well as do elimination fingerprints. The officer had already been questioned. These people knew we were investigating a double murder. These people knew that they were looking for a shotgun. They now have a shotgun that they got from the defendant. So this defendant was not, you know, all of a sudden sprung on him, the idea that they were, you know, looking for him as a possible suspect at that point when they asked the ballistics question. Thank you, counsel. Ms. Anders. Mr. Chief Justice, and may it please the Court. In Minnesota v. Murphy, this Court applied the general rule that the Fifth Amendment privilege is not self-executing and that a suspect must invoke it in order to claim his protection to a noncustodial interview in which the probation officer doing the questioning was aware that the questions that she asked could be incriminating. The Court there held that because the suspect had not invoked his Fifth Amendment rights, his statements could be used against him as evidence at trial. A suspect's silence should similarly be admissible against him when he fails to express and invoke the privilege, requiring invocation in that circumstance. Sotomayor, I think you have to understand that this Court, to me, is such a radical position that silence is an admission of guilt. That's really what the argument is. I certainly understand that speaking can implicate you, and if you choose to speak, clearly whatever you say can be used against you unless you're in custody and unless you've invoked the right before, but this is radically different. Sotomayor, you're trying to say acts of commission and omission are the same, but statements are different than silence, because then you're making the person who's asking this question your admission. You're saying you're adopting their statement as true. Well, I think this Court has repeatedly recognized that when a citizen is voluntarily interacting with the police and there's no coercion because it's not a custodial situation, we expect that person to be treated as fully capable of deciding whether or not to assert his rights. This is what the Court said in United States v. Drayton in an analogous context, which is whether someone has voluntarily consented to assert. The person, even if he's not told that he can refuse to consent, we still assume that he knew that he could refuse to consent, and therefore it was a voluntary choice. And I think you can draw the same inference here, that when someone we – I think we all agree that most people know what their Fifth Amendment rights are, and therefore they can assert them when they don't face any coercive pressure. And so when a person does not do that – Kagan, we don't require invocation at trial, and we don't require invocation in a custodial setting. And you might say, well, custodial, that's very different, because after all, custodial is inherently coercive. But that's the whole point of Miranda warnings, is that once we give Miranda warnings, that coercion is dispelled, and a custodial setting essentially becomes like a noncustodial setting. So if we don't require invocation even after Miranda warnings are given in a custodial setting, why should we require invocation here? Well, I think the reason that we don't require invocation in the Miranda setting I think highlights the fundamental difference between custodial interrogation and noncustodial interrogation. So in the custodial setting, the Court has said that the suspect faces inherent coercive pressures to confess. And therefore— Kagan, and that's why we give the warnings, and then that's gone. That's why we give the warnings. And in the warnings, we promise the suspect that his silence will not be used against him. And so this is what the Court said in Doyle v. Ohio, that because of that promise, the suspect does not have to expressly invoke and his silence can't be used against him. But in the voluntary situation, we presume that the suspect knows his rights, and because he's not facing any pressure, he can simply say, I don't want to answer that question. And so when he doesn't say that— Ginsburg, you said in your brief that there might be a whole other, many other reasons for remaining silent. And I suggested that in this kind of scenario, the most likely reason is that the suspect will ham up, is that he fears incrimination. But what are these other reasons unrelated to the Fifth Amendment why a defendant might remain silent? I mean, the Griffin rule is he doesn't have to say, I plead the Fifth, because we assume that when he doesn't take the stand, he's doing so because he doesn't want to incriminate himself. That's right. The Griffin rule says, or it's premised on the idea that when you fail to testify at trial, you are inherently exercising your Fifth Amendment right. But I think when you're looking at a noncustodial interrogation, the question whether the person is trying to exercise his Fifth Amendment right, I think the operative question is not whether he wants to avoid inculpating himself, it's whether he wants to refuse to answer as a matter of right. And I think we know that because if you look at the interview as a whole, presumably his overarching motivation is not to inculpate himself. That's why his statements can be used against him at trial, because those statements we the Court held in Minnesota v. Murphy, those statements are inconsistent with a desire to refuse to answer as a matter of right. Breyer, are you conceding the point that they make, that even if in the custodial setting he waives his Miranda right, he answers 500 questions but doesn't answer one of the 500, that the prosecutor cannot comment on that fact that he didn't answer that one? I think that raises a question. What do you think? He says no, you can't, and he quotes Miranda. Okay. What do you think? Well, there's a circuit split on that, and I think the circuit split shows that it raises a different analytical question that the Court doesn't have to get into here. The circuit split is that some courts say, as I understand it, that even after the person waives his Miranda rights, Doyle still applies. And so you can't use his silence against him. And some of those other courts say, no, once he's waived his Miranda rights, he's essentially in the same situation as he would be if he weren't the defendant. Kennedy, I think we think that the better view is that Doyle probably does not apply, but I think there's a serious question there. And I think the Court doesn't have to resolve it here, because, again, that highlights the distinction between custodial and noncustodial interrogation, that once the suspect has been promised. Kennedy, what is your answer to Justice Kagan's earlier question, to the hypothetical that the defendant just says nothing for 20 questions? Well, I think the standard. And there's no Miranda warning, and no custody? Right. So like this case, except 20 questions. Well, I think the standard is whether the suspect has done something that reasonably can be construed as invocation. This is the standard that the Court announced in United States v. Quinn a long time ago, but it's also the same formulation that the Court used in Davis and Burgess. What does that mean? Does he just – how about if he just says, you know, I don't really want to answer that question? I think if he expresses a desire not to answer the question, that is sufficient, because he's saying I'm not going to answer that, and implicitly he has a right not to do that. I think the 20 questions hypothetical that Justice Kennedy proposed, probably that would not be sufficient by analogy to Tompkins, where the suspect sat silent for an hour. Ginsburg. I don't think you – you were going to tell me this great deal of conduct, what silence could mean other than, I fear, incrimination. What else? Absolutely. I think there are several types of – there are several mental states that silence can reflect that are both probative of guilt and not consistent with a desire to refuse to answer the question as a matter of right. So, for instance, the suspect could want to answer the question, but have trouble coming up with an exculpatory answer. He could strategically decide that he's just going to sit silent for a bit to see what else the prosecution – or, I'm sorry, the police say in order to spin it out, see what they know. He could be dismayed or shocked momentarily because the question reveals that the police have more evidence than he thought they did. So I think in all of those situations, those mental states are not consistent with a desire to invoke the privilege, and that's why Petitioner's rule is essentially a prophylactic rule that would protect a great deal of conduct that has nothing to do with a desire to exercise the Fifth Amendment right. I think this case is a good example of that, where you have a suspect who speaks for, you know, several minutes, you know, half an hour, whatever, and he's answering questions in an exculpatory manner. He's suddenly silent in response to one question. And so I think the inference that can be drawn there is that he was surprised by the question, didn't know how to answer it in the most exculpatory manner. Kagan.  Kagan. But, Ms. Enner, suppose, you know, he thinks that the interview was going to be one thing, and then it turns out that the interview was something else. He realizes, it dawns on him, that the police really do see him as a suspect. And he says to himself, I'd better stop answering, right? So he says, okay, he's answered a bunch of questions already, but now he says, you know, I don't want to answer any more questions. Is that an invocation? Enner. I think that would be sufficient, yes, to say I don't want to answer any more questions. And I think that's sufficient to invoke with respect to questions on that topic. And I think, as in Tompkins, I think it's important to have a clear rule here, because invocation does affect what's going on. Kagan. That doesn't sound like a clear rule. I mean, you know, as between, you know, I don't want to answer those questions on a particular topic, I don't want to answer that question, or just, like, could we go on to a different question, or, I don't know, why is that different? Well, I think it's an objective standard, and it's the same formulation that the Court has already adopted in Burgess, in Tompkins, and in Davis. So in the Miranda context, the Court has already faced this problem. How do we know when the defendant has invoked his rights, and what should the standard be? And it has said that it is an objective standard, it's what's reasonably perceived as an invocation. And so, you know, the lower courts are very used to applying that. I think it's very administrable, because Sotomayor What's not administrable about telling the police? You just can't argue to a jury that merely not asking a question is guilt. What lacks administration? Well, I think there are a variety of circumstances in which, as I said before, silence is probative of guilt, and so the question is whether you want a broad prophylactic rule that will protect a great deal of conduct that has nothing to do with the exercise of the right. Roberts. Thank you, counsel. Mr. Fisher, you have 4 minutes remaining. Fisher. Thank you. I'd like to make three points. First, Justice Breyer, your question about the state of the law with respect to question number 432. At our reply brief at page 4, we cite cases that are all Fifth Amendment cases, and Canterbury also, which is a Tenth Circuit case cited elsewhere in our brief, uniformly holding that the Fifth Amendment applies. The Assistant Attorney General, when they speak about a circuit split with relation to Doyle, they're talking about impeachment cases. Remember, Doyle and Jenkins, which are the cases the State cited to you in response to your question, are impeachment cases that are entirely different. Second, if I — we can look at the transcript this afternoon, but I believe both the State and the Assistant Attorney General have said to you today, if Mr. Salinas would have said, I don't want to answer that question, then he would win, then Griffin would apply. But because it was somehow ambiguous that it shouldn't, that is ridiculous. If you look at the transcript in this case, what did the officer testify when he said — he asked him the question, he said, he did not answer? What did the prosecutor argue to the jury in closing, verbatim, of what the State is telling you today, is all Mr. Salinas had to say. At closing, the State said the police officer testified that he wouldn't answer that question. He didn't want to answer that. So the whole principle behind express invocation jurisprudence is to put the State and the police on fair notice that somebody is exercising the right to remain silent. There was zero ambiguity in this case that was going on. So it explains why the rule that the State and the Assistant Attorney General have fallen back on in court today is formalism of the absolute worst kind. And the only thing that this formal requirement of saying some sort of magic words — and I agree with Justice Kagan, I don't know what they are, but whatever they are, what exactly what the State argued to the jury apparently would have been enough — is just nothing more than a trap for the unwary, who is told through culture and learning that he has a right to remain silent. And he does the one thing that is consistent with his right, which is exercising it, and somehow the State is telling you that it can walk into court and say, because he remains silent, he's guilty of a crime. Jury, you should conclude he's guilty of a crime. And, Justice Sotomayor, when you ask the State, well, what about an officer that tells the defendant, as he will have every incentive to do in South Carolina v. Neville in a roughly comparable situation, the law enforcement actually admitted they were already doing it, but the States tell you they will do it here, when the officer says, if you don't answer, we're going to use that against you, the State said that would be coercion, but the officer would be doing nothing more than stating the rule the court is asking you to announce today. So wouldn't the defendant know the law? Don't we assume that the suspect knows the law? And the State's telling you, well, if the officer tells the person what the law is, it's coercion. So, really, what we're asking today is nothing radical. It's nothing out of a departure of our deepest traditions, which require the government to shoulder the load itself, to prove the case itself, and not to enlist the defendant as an instrument in his own demise. And finally, I hope the confusion with respect to the burghess as related to this case has been dispelled. I think Justice Kagan got it exactly right. But, remember, another way to make it clear is that if Mr. Salinas had said in response   to the question, I'd like for you to stop asking me questions, the police wouldn't have had to honor that. Somebody not in custody doesn't have a right to have questioning cut off. So the police could have kept asking him questions. That's the only right that a custodial suspect has and needs to expressly invoke. The right to remain silent is not something that's ever had to be expressly invoked by somebody in custody or not in custody, and there's no good reason to require it to be invoked here. If the Court has any further questions, I'd be happy to entertain them. Otherwise, I'll submit the case. Sotomayor, I'd like to go back to what Justice Ginsburg argued, because there is an argument here that there wasn't an invocation of the right, that by physical conduct there was a statement. Would you have had a problem if the prosecutor had argued at trial? You know, when he was asked about this testing, he didn't remain silent. He got nervous. No, that would be a different case. And that shows his guilt. That would be an entirely different case. And we wouldn't have a problem with the State making legitimate arguments based on demeanor evidence that is itself communicative as opposed to what it did in this case, which is argue that his silence demonstrated his guilt. Thank you, counsel. The case is submitted.